# 𝔖𝔱𝔞𝔲𝔫𝔱𝔬𝔫.

## APPALACHIAN POWER COMPANY *v.* BYRD A. ROBERTSON.

### September 17, 1925.

1. MASTER AND SERVANT—*Liability of Master for Acts of Servant—Scope of the Master's Business.*—A master is not liable for every wrong which the servant may commit during the continuance of the employment. The liability can only occur when that which is done is within the real or apparent scope of the master's business. Beyond the scope of his employment the servant is as much a stranger to his master as any third person. The master is only responsible so long as the servant can be said to be doing the act, in the doing of which he is guilty of negligence, in the course of his employment.

2. MASTER AND SERVANT—*Liability of Master for Acts of Servant—Scope of Employment—Whether Act is in Course of Servant's Employment.*—In determining whether a particular act is done in the course of the servant's employment, it is proper first to inquire whether the servant was at the time engaged in serving his master. If the act be done while the servant is at liberty from the service, and pursuing his own ends exclusively, the master is not responsible. If the servant was, at the time when the injury was inflicted, acting for himself, and as his own master, *pro tempore*, the master is not liable. If the servant steps aside from his master's business, for however short a time, to do an act not connected with such business, the relation of master and servant is for the time suspended.

3. QUESTIONS OF LAW AND FACT—*Question for Court where there is no conflict in the Evidence—Whether Acting within Scope of Servant's Employment—Case at Bar.*—In the instant case, an action against a master for the negligence of his servant, so far as the evidence related to the question of whether the act complained of was done in the course of the servant's employment, there was no conflict, and, therefore, there was presented a question of law for the court.

4. NEGLIGENCE—*Questions of Law and Fact—Negligence a mixed Question of Law and Fact.*—Whether one had been guilty of negligence or not is a mixed question of law and fact to be determined by the court when the facts are not disputed or conclusively proven, but not to be withdrawn from the jury when the facts are disputed or the evidence is in conflict.

5. MASTER AND SERVANT—*Whether Acts were within the scope of Servant's Employment—Laborer of Power Company Returning from Dinner to Work Assisting a Driver of a Wagon to get the Wagon beneath Wires of the Company—Case at Bar.*—In the instant case plaintiff driving a wagon on a private way found lying on the ground across the way three copper wires belonging to defendant, a power company. Just then a laborer, employed by the company, approached returning from his dinner to work with his gang, who were over a hill out of sight several hundred yards away. The laborer had no orders or duties with reference to the wires lying on the ground. Plaintiff asked the laborer whether he could drive over the wires and the laborer told him that he could not, but that he would hold the wires up so as to permit him to pass under them. This he did and while plaintiff was assisting him in holding up the wires with his left hand and holding the horse with his right hand, the horse became frightened, broke from control of plaintiff, ran away and struck plaintiff's leg, breaking it.

*Held:* That the laborer was not acting within his scope of employment when he attempted to assist plaintiff.

6. MASTER AND SERVANT—*Whether Acts were within the Scope of Servant's Employment—Laborer of Power Company returning from Dinner to Work Assisting a Driver of a Wagon to get the Wagon beneath Wires of Company—Case at Bar.*—Where a laborer, employed by a power company, returning to his work from dinner, offered to assist the driver of a wagon to get his wagon under wires of the company lying in the road, his act was voluntary and merely an act of courtesy which any passer-by would have been likely to proffer. Having so volunteered, it became a joint enterprise of the plaintiff and the laborer for the accomplishment of the special business of the plaintiff, which was not the business either of the laborer or the company, and in that joint adventure the plaintiff himself was the principal. It was he who knew his horse; he who had control and direction of the horse and his movements; he was the chief actor, while the laborer was his helper, acting in a matter having no relation to his employment as the servant of the company; and if there was any negligence it was the concurrent negligence of both.

7. MASTER AND SERVANT—*Liability of Master—Servant Acting under the Direction of Another or for the Accommodation of a Third Party.*—Where a servant acting outside of the scope of his employment does an act under the direction of or solely for the accommodation of a third party, the master is not liable.

8. MASTER AND SERVANT—*Scope of Employment—Questions of Law and Fact.*—Where, under the undisputed facts, defendant's servant at the time of the injury to plaintiff was acting beyond the scope of his employment, it is error to leave the question as to whether the servant was acting within the scope of his employment to the jury.

Error to a judgment of the Circuit Court of Pulaski county in an action of trespass on the case. Judgment for plaintiff. Defendant assigns error.

*Reversed.*

The opinion states the case.

*Robt. E. Scott* and *Jno. S. Draper*, for the plaintiff in error.

*H. C. Gilmer* and *O. C. Brewer*, for the defendant in error.

Prentis, P., delivered the opinion of the court.

This is an action for personal injury in which Byrd A. Robertson, hereafter called the plaintiff, has recovered $3,000.00 as damages against the Appalachian Power Company. It is claimed that the injury was caused by the negligence of one Conner, an employee of the company, for which it is responsible. Among the defenses made is that at the time of the occurrence Conner was not acting within the scope of his employment.

While the law upon this question appears to be simple, there has always been very great difficulty in its application, and it has been frequently said that it is impossible to state it briefly and comprehensively so as to be clearly applicable to all cases, because of the ever-varying facts and circumstances of particular cases.

[1, 2] It seems to us that one of the best statements on the subject is found in *Morier* v. *St. Paul Ry. Co.*, 31 Minn. 351, 17 N. W. 952, 47 Am. Rep. 793, where this is said: "A master is not liable for every wrong which the servant may commit during the continuance of the employment. The liability can only occur when that

which is done is within the real or apparent scope of the master's business. Beyond the scope of his employment the servant is as much a stranger to his master as any third person. The master is only responsible so long as the servant can be said to be doing the act, in the doing of which he is guilty of negligence, in the course of his employment. And, in determining whether a particular act is done in the course of the servant's employment, it is proper first to inquire whether the servant was at the time engaged in serving his master. If the act be done while the servant is at liberty from the service, and pursuing his own ends exclusively, the master is not responsible. If the servant was, at the time when the injury was inflicted, acting for himself, and as his own master, *pro tempore*, the master is not liable. If the servant steps aside from his master's business, for however short a time, to do an act not connected with such business, the relation of master and servant is for the time suspended. Such, variously expressed, is the uniform doctrine laid down by all the authorities."

In the note to *Goodloe* v. *Memphis, etc., R. Co.* (107 Ala. 253), 18 So. 166, 29 L. R. A. 729, 54 Am. St. Rep. 72, it is said that "the simple inquiry and true test is not whether a given act was done during the existence of the servant's employment, but whether it was in the course of the servant's employment, or outside of it. *Mott* v. *Consumers' Ice Co.*, 73 N. Y. 543; *Cosgrove* v. *Ogden*, 49 N. Y. 255, 10 Am. Rep. 361; *Davis* v. *Houghtellin*, 33 Neb. 582, 586 [50 N. W. 765, 14 L. R. A. 737]; *Eckert* v. *St. Louis Transfer Co.*, 2 Mo. App. 36; *Sagers* v. *Nuckolls*, 3 Colo. App. 95 [32 Pac. 187]."

[3] In this case, so far as the evidence relates to this particular point, there is no conflict, and therefore it presents a question of law for the court. *Healey* v. *Cockrill*, 133 Ark. 327, 202 S. W. 229, L. R. A. 1918D,

115; *Ritchie* v. *Waller*, 63 Conn. 155, 28 A. 29, 27 L. R. A. 161, 38 Am. St. Rep. 361; *Wells* v. *Henderson Land & Lumber Co.*, 200 Ala. 262, 76 So. 28, L. R. A. 1918A, 115; *Barmore* v. *Vicksburg, etc., R. Co.*, 85 Miss. 426, 38 So. 210, 70 L. R. A. 627, 3 Am. & Eng. Ann. Cas. 594.

[4] In *Winchester* v. *Carroll*, 99 Va. 727, 40 S. E. 37, it is said that the general doctrine is that whether one had been guilty of negligence or not is a mixed question of law and fact to be determined by the court when the facts are not disputed or conclusively proven, but not to be withdrawn from the jury when the facts are disputed or the evidence is in conflict.

These are the undisputed facts showing the relation of Conner to the company at the time of the alleged act out of which it is claimed the liability arises:

[5] The plaintiff was driving a single horse and wagon along a private roadway through an orchard to deliver his load. The company had a line of poles and wires across this roadway, and was restringing certain wires. In connection with this work three copper wires were lying on the ground across this private way when the plaintiff approached. About this time Conner, who was a laborer employed by the company, being a member of a certain gang working under the orders of a foreman named Carter, approached. His gang were then at work over a hill and out of sight several hundred yards away. Conner had been to his dinner and had not returned to his work. He had no orders or duties whatever with reference to these wires so lying on the ground. The plaintiff asked Conner whether he could drive over them, and Conner told him that he could not, but that he (Conner) would hold the wires up so as to permit him to pass under them. They together proceeded to carry out this purpose. The horse was said to be a "high-headed" horse, and they found it difficult.

to raise the wires high enough to get them over his head, so that they struck him about the eyes. At this juncture, the plaintiff was standing at his horse's head, holding him by the bit with his right hand, and assisting in holding up the wires with his left hand. Then during their joint effort to get the horse and wagon safely under these wires, the horse became frightened and unmanageable. The plaintiff held on to him, and he lunged around, the plaintiff continuing his efforts to stop and control him, but failed, and the horse ran the wagon against one of the poles of the company, about sixty-one feet away, which stopped him, one of the horse's feet struck the plaintiff's leg, breaking it, and so causing him serious injury.

The evidence is in conflict as to why the horse, apparently under the plaintiff's control, suddenly became frightened. According to Conner, the wires were passed safely over the horse's head, the hames, the raised seat of the wagon and he was entirely free while running away. According to the plaintiff, after the wire struck the horse about the eyes, Conner jumped up and suddenly threw the wires on the horse's neck and so caused him to run away. This is the negligence relied on to establish the liability.

These facts raise the vital question to which our attention is directed. Was this laborer, Conner, acting within the scope of his employment when he attempted to assist the plaintiff in the manner indicated?

This evidence seems to be the slender thread upon which the case depends:

Carter, the foreman of the gang, having shown that Conner was a laborer and had no orders from him as to driving or leading the horse under these wires; that he (Carter) was not present; and that Conner worked under his direction, said this, referring to the work:

"Q. For instance, if you tell a man to stretch a wire, you would not tell him how to take hold of it?

"A. I generally told them where to put it.

"Q. You told them where to put it, and then they went and put it?

"A. Yes, sir.

"Q. Well, you certainly would have expected your men, or any of them, wouldn't you, Mr. Carter, in the course of that work down there, to have done whatever was reasonably necessary to take care of the property? That was required, wasn't it, of your men—they understood that?

"A. Yes, sir.

"Q. How far, at the time of the accident, was the gang of men that you were with away from the point of the accident?

"A. They were some four or five hundred feet across the hill, or maybe a little further."

The case, then, is not like those cases in which the master has been held responsible, where the servant, during his working hours, went off on certain business of and for the master, from which without orders or against the orders of the master, he had deviated slightly for the purpose of attending to some business of his own. In such cases, the acts of the servant have generally been held to be within the scope of his employment. This man, Conner, at the time of the accident, was not engaged in any business for his master. It was during an intermission in his work, his dinner hour, at a time when he was absolutely free from the control of his master, or Carter, under whose direct control he was employed to work. He had not returned but was on his way to his task to resume it under orders with the rest of the gang. He had no orders at the time and being absent, the master had no control whatever

over his conduct at that time. There is nothing in the record to indicate that it was necessary to raise these wires, or that any damage would have been done to them if the wagon had been driven over them, or that it would have been forbidden by the foreman if he had been present. There is evidence sufficient to show that by leaving the regular roadway and driving some 200 or more feet around the point where the wires were lying, the plaintiff could have gotten the horse and wagon under them, because they were temporarily fastened twenty feet above the ground to a pole. So far as the statement of Carter is concerned, that is, that he would have expected their men in the course of their work down there to have done whatever was reasonably necessary to take care of the property, this statement has to us little significance, because in the first place, Conner was not at his work "down there" but was away from it, and besides any good citizen would have been expected to prevent trespassers from wilfully injuring the property.

[6] It seems to us that Conner's act was voluntary and merely an act of courtesy which any passer-by would have been likely to proffer. Having so volunteered, it became a joint enterprise of the plaintiff and Conner for the accomplishment of the special business of the plaintiff, which was not the business either of Conner or the company, and in that joint adventure the plaintiff himself was the principal. It was he who knew his horse; he who had control and direction of the horse and his movements; he was the chief actor, while Conner was his helper, acting in a matter having no relation to his employment as the servant of the company; and if there was any negligence it was the concurrent negligence of both.

[7] As has been indicated, each case seems to present

its own peculiar difficulties, but in the evolution of the law, certain classifications have developed, which are helpful. This occurrence is to be classified as one of those in which the servant, acting outside of the scope of his employment, does an act under the direction of or solely for the accommodation of a third party.

A typical case illustrating this is *American Railway Express Co.* v. *Wright*, 128 Miss. 593, 91 So. 342, 23 A. L. R. 127, and note. In that case a lady went to the office of the express company for the purpose of shipping two express packages, and was requested by the servant of the company who was there to wait until the agent in charge of the office came back to see whether the packages were properly wrapped. Thereupon the lady requested the employee who was there to be allowed to leave a piece of fur and an umbrella in the office until she should return, which permission was granted. When she returned she shipped the two packages and then asked the employee for her fur and umbrella. She was given the umbrella, but was told that the fur had not been left there. She later returned and asked again for the fur, and in an altercation which ensued was then insulted and abused by the servant of the express company. It was held that the leaving of the fur in the office was not a part of the master's business; that it was not within the real or the apparent scope of the authority of the employee to be allowed to leave it there; and that this abusive language was not used when the appellee was in the office of the company to transact business with the company, but after her business with the company had been completed; and these being the facts it was held that a peremptory instruction in favor of the express company should have been given.

A case involving the same principle is *Chesley* v.

*Woods Motor Vehicle Co.* (1909), 147 Ill. App. 588. There the plaintiff prosecuted his employment around Chicago by traveling in an automobile of his employer, which was kept at the garage of the defendant. This plaintiff had a case of samples which he carried with him daily, and at night he was in the habit of giving this sample case to the porter of the defendant, who received and cared for the automobile, who placed the sample case in the garage office. Then each morning he would receive it from the porter when he called for the automobile. On one occasion plaintiff took the automobile to be repaired and left his sample case with the porter, saying to him that he would return for it later. He did not call for the sample case until more than three months after leaving it. In the meantime defendant had moved its garage business to another place in Chicago, and the porter had quit its employ. The sample case was apparently lost. ·It was held that the defendant, the garage keeper, was not liable, the court saying: "The record discloses no evidence amounting to the dignity of proof that the porter, at the times when he received plaintiff's sample case, was acting within the scope of his employment; nor does it appear that defendant, or any of its office force, had any knowledge relating to the custody of the sample case or of its existence, until after its loss and the complaint subsequently made in consequence of such loss." It was also held that it was the duty of the plaintiff to look to the porter for the return of his sample case.

In *Lloyd* v. *West Branch Bank* (1850), 15 Pa. 172, 53 Am. Dec. 581, 1 Am. Neg. Cas. 574, a bank depositor left a package of notes with the cashier for safekeeping. It was held, upon this phase of the case, that there being no evidence of any general usage, custom or practice of the cashier of that bank to act as a voluntary bailee of

currency without reward, that the bank could not be held liable.

In *Vandeymark* v. *Corbett* (1909), 131 App. Div. 391, 115 N. Y. Supp. 911, a sheriff having levied on certain live stock, left the property for a time in the custody of an employee of the defendant, and this employee converted it to his own use, and it was held that the master of this servant could not be held responsible for this illegal conversion, because it was beyond the scope of his employment.

In *Walker* v. *Hannibal & St. J. R. Co.* (1894), 121 Mo. 575, 26 S. W. 360, 24 L. R. A. 363, 42 Am. St. Rep. 547, it appeared that a baggageman on a railroad was in the habit of carrying certain drills gratuitously in the baggage car, and throwing them off at points designated by the owner. This baggageman threw off a drill, which struck and injured the plaintiff. It was held that the railroad company was not liable, and the court says this: "Before the defendant can be held liable for the negligent act of its baggageman, it must be made to appear not only that at the time of the injury he was its servant and in its employ, but that the act of the servant which occasioned the injury was done in the course of his employment. The master is not liable for the acts of the servant which are not connected with the service which the servant had been employed to perform. If, for instance, a servant should be employed to do a particular thing or kind of work, and does something else, without his master's consent, and, by reason of his negligence or carelessness, another is injured, the master is not liable, because the injury was not done in the course of his employment. In order that the master may be held liable, the act causing the injury must pertain to the duties which the servant was employed to perform. If the baggageman, in delivering the drills,

was not serving his master, but was merely doing so to accommodate others, and the master was deriving no benefit therefrom, then the master is not liable, even though the injury complained of would not have been committed without the facilities afforded by the baggageman's relations to the defendant.''

This is the rule which should be applied under the facts of this case. Conner was off duty; he then had no responsibility whatever to his master at the time he agreed with the plaintiff, and for the plaintiff's accommodation, to aid him in getting his horse under the wires; he was free from his master's control.

Closely related to the rule that where the act is merely an act of courtesy to a third person, the master is not liable, is a line of cases which do not refer to the idea of courtesy, but deny the liability of the master when the act of his servant is a service performed at the direction of and for a third person, and not for or under the direction of the master. *Sawyer* v. *Martins*, 25 Ill. App. 521.

In *Olive* v. *Whitney Marble Co.*, 103 N. Y. 292, 8 N. E. 552, it appeared that the defendant had bought a boiler, but the vendor was under contract to put it in proper condition. The vendor sent its employees for that purpose, and the defendant's engineer, who was assisting these employees of the vendor, did an act which resulted in the explosion of the boiler, and the defendant was relieved of responsibility because its engineer was acting beyond the scope of his employment and assisting the vendor's agents, and hence the defendant was relieved of responsibility.

This rule was applied in *Murphey* v. *Caralli*, 5 Hurl. & C. 462, 34 L. J. Ex. 14, 10 Jur. (N. S.) 1207, 13 W. R. 165. There certain servants of the defendant negligently piled cotton in a warehouse, and an injury re-

sulted; but the defendant was held not responsible because these servants of his, while in the warehouse and doing the negligent act, were acting solely under the direction and control of the warehouse keeper, and because they were then beyond the defendant's control and at the time under the warehouse keeper's control, the defendant was not liable.

In *Rourke* v. *White Moss Colliery Co.* (1877), L. R. 2 C. P. Div. 205, 46 L. J. C. P. 283, 35 L. T. (N. S.) 49, 25 W. R. 263, it appeared that the defendants began sinking a shaft in their colliery, but thereafter agreed with Whittle to do the sinking and excavating at a certain price per yard, Whittle to find all the labor, but the defendants to provide and place at the disposal of Whittle the necessary machinery and an engineer to work the engine (this engineer being employed and paid by the defendants), but both the engine and the engineer were to be under the control of Whittle. The plaintiff in that case was employed and paid by Whittle, and while working at the bottom of the shaft was injured by the negligence of this engineer who was employed and paid by the defendants, but was under the control of Whittle. It was held that although this engineer remained the general servant of the defendants, yet because he was under the orders and control of Whittle at the time of the accident, he was then acting as the servant of Whittle and not of the defendants, who, therefore, were not liable for his negligence. *Stone* v. *Hills*, 45 Conn. 44, 29 Am. Rep. 640, note.

It is said in Shearman & Redfield on Negligence, section 63, that "if the act be done while the servant is at liberty from service, and pursuing his own ends, exclusively, there can be no question of the freedom from liability, even if the injury could not have been committed without facilities afforded to the servant by his relations to the master."

The principles illustrated by these precedents control and determine this case. Conner, during his meal hour, having left the place at which he was employed to work, and being entirely free from the orders and beyond the control of the master, while performing the service of courtesy or assistance for the plaintiff, working jointly with him, was acting beyond the scope of his general employment, and therefore the defendant company is not liable for his negligence.

[8] This question was raised in the trial court, both by instructions and upon the motion to enter judgment in favor of the defendant, notwithstanding the verdict. The trial court took the opposite view, and left the question as to whether or not Conner was acting within the scope of his employment to the jury. As we have indicated, we think that under the undisputed facts of this case, Conner at the time of the injury was acting beyond the scope of his employment. The instructions granted were, therefore, erroneous, and the trial court should have set aside the verdict and entered judgment for the defendant. This court will correct the error, and enter judgment here, in accordance with the statute, for the defendant.

This conclusion makes it unnecessary to consider the other questions presented by the record, all of which depend upon the fundamental question as to whether or not Conner was acting within the scope of his employment.

*Reversed.*